***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award of the Deputy Commissioner. The Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner with some modifications and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties through the Pre-trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. The employee-employer relationship existed between the plaintiff-employee and the defendant, the North Carolina Department of Correction.
3. The employer is self-insured with Key Risk Management Services as the Administrator.
4. Plaintiff was terminated from his position with Lumberton Correctional effective February 29, 2000, for failure to return to work. He had been out of work since June 10, 1999 and on LWOP since July 1, 1999.
5. Plaintiff was approved for Short Term Disability Benefits on October 8, 1999.
6. The following exhibits were stipulated to by the parties at the hearing before the Deputy Commissioner:
Stipulated Exhibit No. 1 — the records of Dr. Robert Weinstein
Stipulated Exhibit No. 2 — the records of Valerie Nagy
Stipulated Exhibit No. 3 — defendant's response to plaintiff's Rule 607 request
7. The following exhibits were entered into the evidence of record at the hearing before the Deputy Commissioner:
Plaintiff's Exhibit No. 1 — plaintiff's job description
Plaintiff's Exhibit No. 2 — Form 144
Plaintiff's Exhibit No. 3 — plaintiff's statement
Plaintiff's Exhibit No. 6 — plaintiff's W-2 form
Defendant's Exhibit No. 1 — Form 22
Defendant's Exhibit No. 2 — Disability Income Plan
8. The issues before the Commission are whether plaintiff developed an occupational disease as a result of his employment with defendant; and if so, to what benefits is he entitled.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 42 years of age. He is a high school graduate, who served in the military from 1979 to 1982. Plaintiff first applied to work with the Department of Correction in 1987. He went through training and became first a temporary officer and then probationary officer, and finally a full time correctional officer. He started as a trainee at the Robeson Correctional facility.
2. One of plaintiff's first duty assignments was to drive buses moving inmates between camps. During the summer of 1989, he was working with another correctional officer, Mike Wilkins, who made assaults on plaintiff. Wilkins repeatedly held his revolver to plaintiff's head and said he was going to kill him. Plaintiff reported this behavior to Patricia Chavis, who at that time was Program Director at the South Central Unit. Mike Wilkins was then transferred off bus duty.
3. Plaintiff testified that as a result of these assaults by Wilkins, he had recurring nightmares. However, he did not seek medical attention or otherwise make a claim for stress related to these assaults. Plaintiff continued to perform his job without missing work and without any difficulties related to these incidents.
4. In December 1989, plaintiff was promoted to lead correctional officer for the South Central Area inmate transfer bus. He was selected from six candidates. In May 1990, plaintiff received a performance review in which it was noted that he had done an "exceptional" job operating the buses. He was recommended for a one percent pay increase.
5. During the summer of 1990, plaintiff was experiencing marital difficulties, which he had discussed more than once with Patricia Chavis. As he reported to Ms. Chavis, his wife had been through a miscarriage, followed by a difficult pregnancy and birth of a child. In August 1990, they had separated. When plaintiff reported to work on the morning of August 22, 1990, he was emotionally distraught due to his marital problems. He was relieved of his duties for the day and sent home.
6. During this same time period, as he reported to Ms. Chavis, plaintiff had been assaulted by his wife. He had gone home to find his wife busting up items around the house. She tried to run him down with her vehicle, and he had to jump on the hood of her car to avoid being hit. On one occasion, plaintiff woke up to find her standing over him as he lay in bed with a knife in her hands.
7. Plaintiff's wife took out a warrant against plaintiff for "assault on a female." As related in Ms. Chavis' memo of October 2, 1990, these charges were later dropped when plaintiff and his wife reconciled.
8. On October 22, 1993, plaintiff sustained an injury when he was exiting the inmate bus and slipped, falling backwards. He injured his back and underwent physical therapy, and was out of work, receiving workers' compensation benefits through May 11, 1994.
9. In May 1994, plaintiff voluntarily took a demotion from lead correctional officer in the South Central Region to correctional officer and transferred to Lumberton Correctional Center. At that time, Patricia Chavis was the Superintendent at Lumberton, and Michael Hardin was Assistant Superintendent. Captain William Britt was next in the line of supervision. The evidence indicates that for unknown reasons, Michael Hardin and plaintiff did not get along very well from the start.
10. During his assignment at Lumberton, plaintiff was rotated, along with other staff through the duty assignments, which included working the segregation units and the dormitories. These are normal duties and part of the rotation for a correctional officer's assignments. Plaintiff contends that he was given assignments to these posts more frequently than other officers. Plaintiff contends this was due to Hardin's direction, although Hardin did not make these duty assignments.
11. Capt. Britt prepared the duty roster. The evidence does show that Hardin instructed Britt to assign plaintiff to segregation, and that plaintiff may have been assigned there more frequently than other officers. There would be three officers assigned to segregation at a time, so plaintiff was not alone in segregation.
12. The testimony of plaintiff as well as other correctional staff shows that plaintiff did work in areas other than segregation and the dorms, including the front yard, the perimeter, and the gatehouse. Plaintiff acknowledged that as a correctional officer, he should be assigned to various areas of the institution, including segregation and the dormitories. Even if he was assigned to these areas more frequently than other officers, the evidence fails to show that he was under any work — related stress due to these assignments or suffered any ill effects. Plaintiff continued to perform his duties well without problems.
13. Around 1995 or 1996, rumors circulated that plaintiff was selling drugs to inmates. This was a particular problem at the institution and it is not unusual for such rumors to circulate about officers. At least 14 officers resigned or were dismissed in 1997 in the Lumberton area for drug-related matters. Items which plaintiff carried into the prison, such as his lunch, as well as the belongings of other officers, were subject to search when the officers entered the prison.
14. Plaintiff complained about the drug allegations to Ms. Chavis. She told him that they needed to investigate if they heard rumors, but that he had not been formally accused or investigated. Although Hardin suspected him, plaintiff was not formally investigated and nothing was placed in his record regarding these allegations.
15. The evidence does show that these rumors caused difficulty between plaintiff and Michael Hardin, and for some reason, Hardin pursued it. However, the evidence fails to show that it impacted plaintiff's relationships with other officers or his work around inmates. In particular, Lt. William Britt testified that he told Hardin he doubted that plaintiff was bringing drugs into the facility. Further, this was nothing unique to plaintiff's work situation, but a situation where he and one of his supervisors did not trust each other and did not get along well, which can occur in any work situation.
16. During the 1990's when he alleges that he was under stress, plaintiff continued to perform his job well and received performance appraisals of "good" and "very good." In the appraisal for the period from 10/01/97 to 9/30/98 it was noted "Hunt works well with all staff and offenders. He is able to work all assigned post with no problems." In the appraisal done on 3/8/00, it was noted that "Hunt has contact with inmate more frequently than required by policy" and that "Hunt continues to work well with staff as well as inmate population."
17. During the 1990's, plaintiff continued to have marital problems, which he related to Capt. Sandy Thomas, talking with her in detail about his home life. He told Capt. Thomas that his wife had behavior problems. Sometimes his wife would call the prison unit and he would have to leave the shift to go home. At least once, Capt. Thomas herself spoke with plaintiff's wife when she called for him. Capt. Thomas described plaintiff's wife as "incoherent." Plaintiff also told Capt. Thomas about his wife standing over him, threatening, while he was in bed.
18. During this time, plaintiff was also experiencing financial difficulties, which were brought to the attention of Superintendent Chavis. On January 31, 1995, she wrote plaintiff a memo in which she set forth that she had been contacted by his landlord regarding back rent owed. She advised plaintiff that he needed to attend to this promptly. On May 10, 1996, Ms. Chavis issued another memo to plaintiff, in which she advised that Shelby Locklear of the Shannon area had called to complain that plaintiff owed him money for a sprinkler hose system. Ms. Chavis told plaintiff that she expected him to contact Mr. Locklear immediately. She also advised plaintiff that if a third complaint about his financial irresponsibility were received, it would be investigated and handled differently. Plaintiff's financial problems were unrelated to his employment.
19. In 1997, plaintiff took extended family medical leave for about a month due to his wife's illness. In 1998, plaintiff's niece died and he took some time off from work.
20. On June 23, 1999, plaintiff first sought treatment from Dr. Robert Weinstein, a board-certified psychiatrist. He reported to Dr. Weinstein the incidents that had happened ten years earlier when he had been assaulted by co-employee Mike Wilkins. He also complained of the rumors that he was taking drugs into the prison. Plaintiff, however, made no mention of his personal problems, including his marital or financial difficulties. He did not tell Dr. Weinstein about his wife's illness, her miscarriage, her assaults or threats upon him, or the death of his niece.
21. Dr. Weinstein assessed plaintiff with post-traumatic stress disorder (PTSD) which he related to plaintiff's employment, and specifically the incidents when he was threatened by Mike Wilkins in 1989. However, the Full Commission finds Dr. Weinstein's evaluation to be incomplete, since it was based upon an incomplete history and information from plaintiff. Because Dr. Weinstein had no information regarding the numerous personal stressors in plaintiff's life, the Full Commission finds he could not make an accurate assessment.
22. Dr. Weinstein treated plaintiff from June 23, 1999 until the time of Dr. Weinstein's deposition on October 14, 2002. Dr. Weinstein placed plaintiff on mood disorder medication when he began treating him, and saw him primarily to manage plaintiff's medication. Dr. Weinstein felt plaintiff was at an increased risk of developing PTSD because of his employment with defendant, and there was a direct relationship between plaintiff's PTSD and his employment.
23. Dr. Weinstein testified plaintiff was unable to maintain gainful employment and that he functioned in his presence at the level of an infant. Dr. Weinstein's assessment was found inconsistent with the Deputy Commissioner's observations of plaintiff at the hearing before her and plaintiff's ability to maintain employment. Dr. Weinstein testified that plaintiff has regressed to an "infantile" state and is non-functional, but also testified that plaintiff was able to understand what was going on and was competent. Dr. Weinstein testified that plaintiff would show memory problems. Dr. Weinstein's testimony indicates that plaintiff would have problems conversing and could only at times could carry on a conversation.
24. At the hearing before Deputy Commissioner Ledford, plaintiff was alert and communicative and showed no signs of "infantile" behavior. He was able to answer questions completely and thoughtfully. He further showed signs of selective memory. Plaintiff was able to articulate in detail incidents related to his work which he claimed led to the development of his stress and PTSD. However, when he was questioned about personal matters, such as his marital problems, plaintiff often said he could not remember specific events.
25. The Full Commission finds plaintiff was not credible based upon the opinion of Deputy Commission Ledford who had an opportunity to observe plaintiff at the hearing before her and the greater weight of the credible evidence of record.
26. The Full Commission further finds that plaintiff's behavior at his appointments with Dr. Weinstein is not consistent with other testimony regarding his employment, and interaction with co-workers. Though, Dr. Weinstein is found to be credible, his evaluation of plaintiff is not given great weight because of the omission of information by plaintiff and behavior that cannot be objectively explained.
 ***********
Based upon the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff has failed to prove that he developed PTSD as a consequence of a particular accident or incident in the course and scope of his employment with defendant. Even if it were found credible that plaintiff developed PTSD as a consequence of the assaults in 1989, plaintiff failed to file a claim within two years of those assaults. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has failed to prove that he suffers from PTSD as an occupational disease, which was characteristic of and peculiar to his job as a correctional officer. The greater weight of the credible evidence fails to establish a causal connection, where there were also numerous personal stressors in plaintiff's life. N.C. Gen. Stat. § 9-53; see Pulley v. City of Durham,121 N.C. App. 688 (1996).
3. Even if plaintiff developed stress related to his poor relationship and dealings with his supervisor Michael Hardin, that was not unique or peculiar to plaintiff's employment as a correctional officer. Personality clashes or difficulties with supervisors can arise in any employment, and are not the basis for a claim for occupational disease. See I.C. File No. 520141,Randall London v. N.C. Highway Patrol (Full Commission decisionfiled Oct. 25, 1990).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Under the law, plaintiff's claim must be and is hereby Denied.
2. Each side shall bear their own costs, except that defendant is responsible for the expert witness fee of $400 previously approved for Dr. Weinstein.
This the ___ day of June 2004.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CS/kjd